1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LAWRENCE WILLIAMS,

11            Plaintiff,              No. CIV S-03-2518 FCD DAD P

12       vs.

13   COUNTY OF SACRAMENTO
     SHERIFF'S DEPARTMENT, et al.,    ORDER AND
14
              Defendants.            FINDINGS AND RECOMMENDATIONS
15
     _____/
16

17            Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to

18   42 U.S.C. § 1983.  Before the court is a motion for summary judgment, or in the alternative,

19   motion for summary adjudication of issues brought on behalf of defendants Bacoch, Dickerson,

20   Douglas, and Murray.[1]  Also before the court is defendants' motion to strike plaintiff's lodging of

21   a Sheriff's Department Internal Affairs report and plaintiff's request for sanctions.

22                          AMENDED COMPLAINT

23            Plaintiff filed his complaint on December 3, 2003.  On March 25, 2004, the court

24   dismissed the complaint and granted plaintiff leave to file an amended complaint that provided

25   _____

26       [1]  Defendants Zwolinski, Johnson and Powell do not join in the motion.

                                         1

specific allegations concerning the acts of each named defendant.  Plaintiff was also provided the legal standard governing an excessive force claim.  Plaintiff filed his amended complaint on April 22, 2004.  On July 1, 2004, the court found service of the amended complaint was appropriate on defendants Dickerson, Douglas, Bacoch, Zwolinski, Murray, Johnson, and Powell.[2]

In his amended complaint, plaintiff alleges that on May 11, 2003, he and fifteen other inmates were attacked by deputies at the Sacramento County Main Jail.  (Am. Compl. at 3.) The incident occurred after plaintiff and the other inmates were brought in early from their outdoor recreation.  (Id.)  The inmates asked to speak to the sergeant.  (Id.)  Defendant officers Douglas and Dickerson stated that the inmates could lock down the easy way or the hard way. (Id.)  Defendant Sergeant Zwolinski and several officers entered the pod shouting commands and using vulgar language.  (Id. at 4.)  Defendant Zwolinski ordered the inmates to get on the wall. (Id.)  Plaintiff turned to go to the wall but because officers were passing in front of him, he stopped.  (Id.)  Defendant Zwolinski grabbed plaintiff by the collar and threw plaintiff ten to twelve feet, causing plaintiff to hit his head on the wall.  (Id.)  Plaintiff was dazed and felt something run down his face.  (Id.)  An inmate in his cell told plaintiff that he was bleeding and put some toilet paper under the door for plaintiff to use.  (Id.)  Plaintiff asked defendant officer Bacoch if he could pick up the toilet paper to stop the bleeding.  (Id.)  Defendant Bacoch answered, "you need to shut up," and when plaintiff asked to see the doctor, defendant Bacoch replied, "you're not dead and you need to just shut up and do as you're told."  (Id. at 4-5.) Defendant Bacoch did not notify anyone that plaintiff needed medical attention.  (Id. at 5.) Defendant Zwolinski then instructed officers to remove plaintiff from the area and defendant officer Dickerson grabbed plaintiff's right arm and took plaintiff to a classroom.  (Id.)  Plaintiff was rushed to the floor by defendant Dickerson and another officer.  (Id.)  They attempted to

_____

[2] The court did not find service appropriate on defendant Sheriff Lou Blanas.  See Order filed 7/1/04 at 2.

1   hog-tie plaintiff's legs, put a knee on his back and a foot on his neck.  (Id.)  Plaintiff heard

2   shouting and did not know it was directed to him.  (Id.)  Because he did not answer or

3   acknowledge that he understood the officers' commands, his arms were lifted up toward his head

4   until they popped and plaintiff cried out in pain.  (Id.)  Plaintiff contends that the abuse lasted ten

5   minutes or longer.  (Id.)  Plaintiff was taken to the nurse and she stitched two lacerations on his

6   face.  (Id.)  Plaintiff contends that both his wrists were badly bruised and that he lost feeling in

7   his hands.  (Id.)  Defendant Murray conducted the rule violation hearing and had plaintiff placed

8   in the "hole" for five days and placed on a disciplinary diet for three days.  (Id.)  Defendant

9   Murray disregarded the fact that plaintiff was on a special diet.  (Id.)  Defendant Lt. Powell

10  issued a false report and claimed that plaintiff was lying.  (Id.)  Defendant Sergeant Johnson was

11  present during the entire incident and made no effort to control or discipline any of the officers

12  who were violating jail policy.  (Id.)

13              MOTION FOR SUMMARY JUDGMENT/ADJUDICATION OF ISSUES

14  I. Summary Judgement Standards Under Rule 56

15              Summary judgment is appropriate when it is demonstrated that there exists "no

16  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

17  matter of law."  Fed. R. Civ. P. 56(c).

18              Under summary judgment practice, the moving party

19          always bears the initial responsibility of informing the district court
            of the basis for its motion, and identifying those portions of "the
20          pleadings, depositions, answers to interrogatories, and admissions
            on file, together with the affidavits, if any," which it believes
21          demonstrate the absence of a genuine issue of material fact.

22  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

23  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

24  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

25  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

26  after adequate time for discovery and upon motion, against a party who fails to make a showing

1  sufficient to establish the existence of an element essential to that party's case, and on which that

2  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

3  concerning an essential element of the nonmoving party's case necessarily renders all other facts

4  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

5  whatever is before the district court demonstrates that the standard for entry of summary

6  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

7          If the moving party meets its initial responsibility, the burden then shifts to the

8  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

9  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

10  establish the existence of this factual dispute, the opposing party may not rely upon the

11  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

12  form of affidavits, and/or admissible discovery material, in support of its contention that the

13  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

14  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

15  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

16  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

17  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

18  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

19  1436 (9th Cir. 1987).

20          In the endeavor to establish the existence of a factual dispute, the opposing party

21  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

22  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

23  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

24  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

25  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

26  committee's note on 1963 amendments).

1    In resolving the summary judgment motion, the court examines the pleadings,

2  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

4  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

5  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

6  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

7  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

8  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

9  1987).  To demonstrate a genuine issue, the opposing party "must do more than simply show that

10  there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole

11  could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue

12  for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

13    Finally, "[a] scintilla of evidence or evidence that is merely colorable or not

14  significantly probative does not present a genuine issue of material fact" precluding summary

15  judgment.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  See also Summers

16  v. A. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997).  On summary judgment the

17  court is not to weigh the evidence or determine the truth of the matters asserted but must only

18  determine whether there is a genuine issue of material fact that must be resolved by trial.  See

19  Summers, 127 F.3d at 1152.  Nonetheless, in order for any factual dispute to be genuine, there

20  must be enough doubt for a reasonable trier of fact to find for the plaintiff in order to defeat a

21  defendant's summary judgment motion.  See Addisu, 198 F.3d at 1134.

22    On July 21, 2004, the court advised plaintiff of the requirements for opposing a

23  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

24  F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

25  /////

26  /////

II.  Defendants' Motion for Summary Judgment/Summary Adjudication[3]

Defendants argue that under the holding in Saucier v. Katz, 533 U.S. 194 (2001), they are entitled to qualified immunity because their alleged malfeasance does not rise to the level of a constitutional violation.  (Mot. for Summ. J. (MSJ) at 8.)

A.  Medical Care Claim

Defendants argue that defendants Bacoch, Dickerson and Murray were not deliberately indifferent to plaintiff's medical care as prohibited by the Fourteenth Amendment. Defendants note that plaintiff alleges that defendants Bacoch and Dickerson delayed medical treatment of his facial lacerations.  However, defendants argue that plaintiff was seen by medical staff within ten to fifteen minutes after he was injured and that plaintiff has not demonstrated that any delay in treatment resulted in further injury.  (Id. at 10.)  Therefore, defendants assert that defendant Bacoch is entitled to summary judgment and should be dismissed from this suit, and that defendant Dickerson is entitled to summary adjudication of plaintiff's claim of deliberate indifference to his serious medical needs.

As to defendant Murray, who ordered that plaintiff receive a disciplinary diet, defendants assert that at his deposition plaintiff admitted that he was not on any medically prescribed diet when the disciplinary diet was ordered.  (Id.)  Moreover, defendants argue, there are no medical records confirming that plaintiff was on a medically prescribed diet in May of 2003.  (Id. at 11.)  Since plaintiff did not face a substantial risk of serious harm and defendant Murray was unaware of facts from which he could draw an inference that plaintiff would be exposed to a substantial risk of serious harm if placed on a disciplinary diet, it is argued that defendant Murray is entitled to summary judgment in his favor.  (Id.)

/////

/////

---

[3]  See Court Document No. 75.

1    B.  Defendant Douglas

2         Defendants argue that plaintiff cannot state a cognizable claim against defendant

3   Douglas because there is no causal link between defendant Douglas' calling the inmates in from

4   outdoor recreation and the alleged use of excessive force and deliberate indifference to serious

5   medical needs.  (Id.)  Defendants contend that at his deposition, plaintiff admitted that defendant

6   Douglas' only involvement in this incident was to call the inmates in from their outdoor

7   recreation and order them to lock down prior to the arrival of support officers to the floor.  (Id.)

8   There is no allegation that defendant Douglas struck plaintiff or that defendant Douglas denied,

9   delayed or interfered with plaintiff's medical treatment.  (Id.)  Therefore, defendants argue that

10  defendant Douglas is entitled to summary judgment in his favor.

11  III.  Plaintiff's Opposition[4]

12        On October 25, 2006, plaintiff filed a document styled, "Statement Of Genuine

13  Issues Of Material Facts By Opposing Party Of Defendent's [sic] Motion For Summary

14  Judgment/Adjudication Of Issues," which the court construes as plaintiff's opposition to the

15  pending motion for summary judgment.

16  A.  Medical Care Claim

17        Plaintiff argues that deliberate indifference to serious medical needs exists if a

18  defendant denies, delays, or intentionally interferes with medical treatment.  (Id. at 8.)  Plaintiff

19  contends that during an interview by Internal Affairs, defendant Bacoch admitted that she

20  observed plaintiff bleeding but decided that plaintiff did not need immediate medical attention.

21  (Id. at 8.)  Plaintiff attaches portions of the transcript from defendant Bacoch's interview with

22  internal affairs investigators in which she provides the following description of the incident:

23        When they were in outdoor rec.  They came in, they all refused to
           lock down they all sat down decided to have day room, some of
24         them got in the shower, had a grand ol' time.  We were called to
           respond, we all stormed in both doors told everybody drop
25

26        [4]  See Court Document No. 81.

whatever they had and get up against the wall and face the wall, trying to se who the major players were I . . . . I suppose. Um . . . . most of the inmates complied, some did not some just sat there refused to get up and you know made no acknowledgment of the officers at all. I believe Mr. Williams who's one of the ones it was, as I recall he was . . . . I don't remember who grabbed him I . . . . I remember he was . . . . I believe he was grabbed by the shirt and walked over to the wall and the whole way he was resisting and trying to pull away and um . . . . he was put on the wall and told to face the wall and be quiet and um . . . . at that point he told me that "I've got blood on my face I need . . . . I need a tissue" and when I looked at his face he had a little bit of blood runnin' down his face but it wasn't excessively bleeding, it looked like it was already starting to dry and I told him you "this is not the time we'll . . . . we'll get your face looked at, its gonna be a minute" because there were still, there were still inmates resisting all over you know continuously through the pod they were still putting people up against the wall. The guy wasn't bleeding profusely, he wasn't gonna die and so um . . . . I told him you know "turn around, be quiet you're fine its just a little bit of blood, its not even bleeding anymore" and he kept turning around telling me "this is bullshit" "you guys are ridiculous" "you guys can't do this" and he kept taking his hands out of his pants and I told him probably four or five times you known "you need to bury your hands, keep your hands in your pants" and at one point I put my hand on his back and you know, kinda pushed him a little bit forward and said "you need to turn around and face the wall" cause he was turning the upper half of his torso and his body towards me to yell at me and uh . . . . I heard somebody say you know "get him out of here, he's causing a problem" cause he was still yelling "you guys can't do this" "this is ridiculous" and they took him out and that's . . . . that's all I remember.

(Id., Ex. D, at 2.)

Plaintiff argues that defendant Bacoch's delay in obtaining medical treatment for his injury was for non-medical reasons and violated his constitutional rights. (Id. at 9.) Plaintiff also argues that defendant Bacoch failed to inform her superiors that plaintiff needed medical attention and interfered with his medical care by making a medical diagnosis about plaintiff's head injury when she was unqualified to do so. (Id. at 8-9.)

As for defendant Murray, plaintiff contends that he informed defendant Murray about his special diet but defendant Murray nonetheless ordered that plaintiff be placed on a disciplinary diet. (Id. at 3-4.) Plaintiff provides a copy of a special diet order issued on

December 29, 2002 by Dr. Jeff Rose, a dentist with the Sacramento County Medical Systems,

Correctional Health Services.  (Pl.'s Suppl. Opp'n, filed 6/18/07, Ex. C.)  The special diet order,

however, directed only that plaintiff receive a soft food diet for three days.  Plaintiff contends

that he was unaware that the order was issued for a short duration and that, in fact, the main jail

kitchen continued to send him the special diet until he was transferred on September 29, 2003.

(Opp'n at 4, 10.)  Plaintiff contends that since there is conflicting evidence about the diet that

was ordered for him and because defendants failed to carry their burden of proof, the summary

judgment motion should be denied as to defendant Murray.  (Opp'n at 10.)

 As to defendant Dickerson, plaintiff disputes defendants' argument that the delay

in receiving medical treatment did not cause him further injury.  Plaintiff contends that his

medical records show that he was treated for neck and back pain as well as treated for facial

lacerations.  (Id. at 11.)  Plaintiff asserts that he suffered "additional abuse to his wrist, busted lip,

at the hand of Deputy Dickerson."  (Id.)  Plaintiff also argues that he was bleeding for fifteen to

twenty minutes from his facial lacerations and that defendant Dickerson has made contradictory

statements about whether plaintiff was bleeding.  (Id. at 11.)  In this regard, plaintiff attaches a

portion of the interview of defendant Dickerson by Sergeant Woo from Internal Affairs.  Therein,

Sergeant Woo asked whether there was any sign of blood on the ground after plaintiff was

removed from the floor and defendant Dickerson answered, "I didn't see any blood."  (Id., Ex. E,

at 10.)

 Plaintiff also contends that the defendants have made contradictory statements

about whether the force used was necessary when plaintiff was in the classroom, on the ground,

and handcuffed.

 B.  Defendant Douglas

 Plaintiff asserts that when defendant Douglas was interviewed by Internal Affairs,

he stated that he was standing next to defendant Zwolinski when plaintiff was grabbed and

directed to the wall.  (Id. at 3, 11-12.)  Because defendant Douglas failed to intervene, and in fact

9

1    aided in the wrongful act of Sgt. Zwolinski," plaintiff contends that defendant Douglas is a "joint

2    tortfeasor[] and share[s] constitutional responsibility." (Id. at 3, 12.)

3    IV.  Defendants' Reply[5]

4           Defendants argue that plaintiff's opposition fails to comply with Local Rule 56-

5    260(b) which requires the opposing party to specifically admit or deny the moving party's

6    statement of undisputed facts and to provide citations to specific documents which support denial

7    of the summary judgment motion.  (Reply at 1-2.)  Nevertheless, defendants argue that whether

8    plaintiff was a convicted felon/parole violator or a pretrial detainee, the legal standards governing

9    claims under the Eighth and Fourteenth Amendments require him to establish that defendants

10   were deliberately indifferent to his serious medical needs.  (Id. at 3.)  Defendants also argue that

11   plaintiff's factual propositions in his statement of undisputed facts are contrary to plaintiff's

12   statement of claim in his amended complaint.  (Id. at 2.)

13          Second, in response to plaintiff's contention that defendant Douglas was present

14   "when unnecessary force was used against Mr. Williams and failed to intervene as Sgt. Zwolinski

15   threw Mr. Williams" (Opp'n at 3), defendants contend that plaintiff's reliance on the internal

16   affairs interview of defendant Douglas is unfounded.  (Reply at 2.)  As to plaintiff's contention

17   that defendant Douglas aided and conspired in the "wrongful act of Sgt. Zwolinski" (Opp'n at 3),

18   defendants argue that plaintiff offers no evidence to support this assertion and has not alleged a

19   conspiracy in his complaint.  (Reply at 2.)  In addition, defendants argue that the internal affairs

20   interview of defendant Douglas does not evidence an agreement or concerted action among the

21   defendants.  (Id.)

22          Third, as to plaintiff's allegation about his special diet, defendants argue that

23   plaintiff failed to submit any supporting exhibits or other evidence with his opposition, and that

24   /////

25

26       [5]  See Court Document No. 82.

1    plaintiff's assertions, in fact, support defendants' contention that plaintiff was not receiving a

2    medically prescribed diet when the disciplinary diet was ordered.  (Id. at 3.)

3              Lastly, defendants argue that with respect to the medical care claim brought

4    against defendant Bacoch, plaintiff has failed to present any evidence that the alleged 10-15

5    minute delay in obtaining medical treatment resulted in further injury.  (Id. at 4.)  Defendants

6    argue that plaintiff's opposition also fails to show that defendant Dickerson intentionally delayed

7    medical treatment for plaintiff.  (Id.)  As to his claim against defendant Murray, defendants

8    contend that plaintiff admits that his special soft diet was prescribed by his dentist some five

9    months before the incident in question and was for a mere three days in duration.  (Id. at 5.)

10   Defendants argue that plaintiff cannot establish that he faced a substantial risk of serious harm at

11   the time the disciplinary diet was imposed by defendant Murray or that defendant Murray could

12   have drawn the inference of serious risk of harm to plaintiff when he imposed the disciplinary

13   diet.  (Id.)  As to any conspiracy involving defendant Douglas, defendants argue that this claim

14   was never alleged in plaintiff's amended complaint and that he has failed to present any evidence

15   of a conspiracy.  (Id.)  In any event, the statements defendant Douglas provided to the internal

16   affairs investigators which plaintiff refers to in his opposition to the summary judgment motion,

17   fail to provide any support for a conspiracy claim.  (Id.)  Defendants contend that the evidence

18   instead suggests that defendant Douglas did not witness defendant Zwolinski's alleged use of

19   excessive force.  (Id. at 6.)  In this regard, defendant Douglas stated to investigators, "I don't

20   know which wall he [Zwolinski] took him to cause I was going off to secure other inmates by

21   that time."  (Id.; Opp'n, Ex. B at 5.)  Defendants argue that since Douglas was securing other

22   inmates when the alleged incident took place between plaintiff and defendant Zwolinski,

23   defendant Douglas is not responsible for failing to intervene in something he did not witness.

24   (Reply at 6.)

25   /////

26   /////

11

1    V.   Plaintiff's Supplemental Opposition[6]

2          In his supplemental opposition, plaintiff contends that he conducted discovery and

3    requested that defendant Powell produce the bed card which would have verified plaintiff's

4    injuries as well as the special diet he was receiving.  (Suppl. Opp'n at 4.)  Plaintiff argues that

5    defendants did not produce the bed card and that defendant Murray failed to produce any

6    evidence showing that plaintiff was on a non-medical diet.  (Id.)  Plaintiff contends that he

7    informed Murray about his special diet and that although defendant Murray stated he had

8    checked into plaintiff's diet, he did not indicate where he had checked.  (Id. at 5.)  Although

9    confusing, it appears that plaintiff is arguing that if defendant Murray had checked the bed card,

10   defendant Murray would have determined that plaintiff was on a special diet.  Plaintiff also

11   contends that his testimony at his deposition should not be determinative because at that time,

12   plaintiff was sick and taking pain and other medications.  (Id. at 4-5.)

13         As to defendant Douglas, plaintiff contends that when interviewed by internal

14   affairs, defendant Douglas stated he had witnessed the "full event of May 11, 2003, 5 east, 300

15   pod., and states the inmates requested to speak to the Sergeant."  (Id. at 5.)

16   VI.  Defendants' Reply to the Supplemental Opposition[7]

17         Defendants argue that plaintiff has now admitted in his supplemental opposition

18   that it was kitchen staff who voluntarily continued to provide plaintiff with a soft diet and that he

19   was not under a doctor's prescription for a special diet when defendant Murray ordered that he

20   receive a disciplinary diet.  (Defs.' Reply at 2.)  Thus, defendants argue, plaintiff cannot establish

21   that he faced a substantial risk of serious harm or that defendant Murray in fact drew such an

22   inference when he ordered the disciplinary diet.  (Id.)

23   /////

24

25         [6] See Court Document No. 108.

26         [7] See Court Document No. 109.

1  Defendants argue that plaintiff has not presented any evidence of defendant

2  Douglas' individual liability with respect to any of plaintiff's claims.  (Id.)  Defendants contend

3  that when plaintiff merely alleges that defendant Douglas witnessed the events of May 11, 2003,

4  he is seeking to impose group liability which is not recognized under the law.  (Id.)

5  Finally, defendants contend that plaintiff's assertion that his deposition testimony

6  is unreliable because he was ill and on pain medications and antibiotics is a sham and merely a

7  strategic attempt on plaintiff's part to preclude entry of summary judgment.  (Id. at 3.)

8  Defendants contend that plaintiff was questioned about his illnesses and the medication he had

9  taken on the morning of his deposition.  (Id.)  Plaintiff responded that he had merely taken three

10  aspirin for a headache and that he was tired because he did not sleep well.  (Id.)  Moreover,

11  before the deposition began and again at its conclusion, plaintiff testified without reservation that

12  he had provided honest and accurate testimony as best as he could.  (Id.)

13  VII.  Analysis

14  A.  Plaintiff's Claim of Inadequate Medical Care Brought Against Defendants Bacoch,

15  Dickerson and Murray

16  Plaintiff asserts that his right to receive adequate medical care derives from the

17  Eighth Amendment rather than the Fourteenth Amendment because he was not a pretrial detainee

18  on May 11, 2003.  Although the record is not clear regarding plaintiff's status on the date in

19  question, legal standards applicable to a medical care claim under the Eighth Amendment and

20  Fourteenth Amendment are essentially the same.  As the Ninth Circuit has observed:

21  > With regard to medical needs, the due process clause imposes, at a
   > minimum, the same duty the Eighth Amendment imposes:  persons

22  > in custody ha[ve] the established right to not have officials remain
   > deliberately indifferent to their serious medical needs.

23

24  Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir. 2002) (internal quotation

25  marks omitted).

26  /////

A plaintiff claiming constitutionally deficient medical care must prove that he suffered a serious medical condition and that defendants were deliberately indifferent to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A medical need is deemed serious if the failure to treat the condition could result in significant injury or the "unnecessary and wanton infliction of pain."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) (citing Estelle, 429 U.S. at 104).  Deliberate indifference may be satisfied by showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing McGuckin, 974 F.2d at 1060).  Deliberate indifference requires "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'"  Farmer v. Brennan, 511 U.S. 825, 835 (1994) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06).

According to the jail incident report citing plaintiff for insubordination/ disobedience, the incident in question occurred at 2020 hours on May 13, 2003.  (Am. Compl. at 7.)  Plaintiff's medical records indicate that he was seen by medical staff at 2035 hours, or within fifteen minutes after the incident occurred.  (Opp'n, Ex. F; MSJ, Ex. C.)  The medical records indicate that plaintiff suffered from a "minor laceration" to his right cheek bone and right upper eyelid area.  (Id.)  Plaintiff did not at that time report any loss of consciousness and it was noted by medical staff that he was alert and oriented.  (Id.)  His laceration was "steri-stripped," plaintiff was advised not to remove the steri-strip and to avoid washing his face until he was seen by the doctor in the morning.  (Id.)  Plaintiff was also given 800 mg. of Motrin.  (Id.)

Plaintiff does not challenge the medical care he received, but instead claims only that defendant Bacoch should have sought immediate medical care for him.  In this regard, plaintiff argues that defendant Bacoch was aware that he was bleeding and that she was not

qualified to make a medical decision that delayed his treatment.  Deliberate indifference "'may appear when prison officials deny, delay or intentionally interfere with medical treatment[.]'" McGuckin, 974 F.2d at 1059) (quoting Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).  Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to state a cognizable claim of deliberate indifference to a serious medical needs.  Id. at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).  Here, plaintiff has presented no evidence that he suffered harm as a result of the mere fifteen minute delay in his receiving medical attention for his cut. The medical assessment determined that plaintiff had a "minor laceration" and that he was alert and oriented.  As defendant Bacoch explained to the internal affairs investigator, she observed that plaintiff was not bleeding excessively, that the blood was already starting to dry and that inmates were still being secured at that time so she told plaintiff, "this is not the time we'll . . . . we'll get your face looked at, its gonna be a minute[.]"  (Opp'n, Ex. D at 2.)  Plaintiff merely asserts that he had facial lacerations and that defendant Bacoch was aware that he was bleeding. This factual allegation is insufficient to support a claim that defendant Bacoch was deliberately indifferent to plaintiff's medical condition.  The evidence indicates that defendant Bacoch briefly delayed taking plaintiff to the medical clinic due to security concerns, not because she knew of and chose to disregard an excessive risk to plaintiff's health.

Plaintiff has failed to establish that there is a genuine issue as to whether defendant Bacoch was deliberately indifferent to plaintiff's medical condition.  Because of plaintiff's complete failure of proof concerning this essential element of his claim, summary judgment should be granted in favor of defendant Bacoch.

The court also finds that summary judgment should be granted in favor of defendant Murray.  Plaintiff has submitted no evidence that he had a medical condition requiring that he remain on a soft food diet.  Likewise plaintiff has failed to present evidence that the disciplinary diet imposed was harmful to his health in any way.  The fact that plaintiff, apparently

1    in error, happened to be receiving a special diet at the time the disciplinary diet was ordered is

2    irrelevant.  Plaintiff has not shown that he suffered from a serious medical condition which was

3    adversely affected by the imposed disciplinary diet.  Again in this regard, since plaintiff has

4    failed to establish the existence of an essential element of his inadequate medical care claim

5    against defendant Murray, summary judgment should be granted in favor of defendant Murray.

6            Finally, as to defendant Dickerson, the defendants' motion seeks summary

7    adjudication only as to the plaintiff's claim of inadequate medical care and not to his excessive

8    force claim.  In opposition to defendants' motion, plaintiff disputes the contention that defendant

9    Dickerson was unaware that plaintiff was bleeding.  (Opp'n at 11.)  Plaintiff refers to the internal

10   affairs interview of defendant Dickerson during which the following exchange took place:

11            WOO:  You didn't see any officer using excessive force against
              Williams without any provocation?
12
              DICKERSON:  Absolutely not . . . . no.
13
              WOO:  Was there any sign of blood on the ground after he was
14            removed from the floor?

15            DICKERSON:  I didn't see any blood.

16   (Id., Ex. E, at 10.)

17           As set forth above, summary judgment is appropriate when there is a complete

18   failure of proof by the non-moving party with respect to an essential element of his case.  Again

19   in this instance, plaintiff has not provided any evidence that would support a conclusion that

20   defendant Dickerson was deliberately indifferent to plaintiff's medical condition.  See Addisu,

21   198 F.3d at 1134 (for any factual dispute to be genuine, there must be enough doubt for a

22   reasonable trier of fact to find for the plaintiff in order to defeat a defendant's summary judgment

23   motion).  Indeed, defendant Dickerson's statement to internal affairs supports summary

24   adjudication in his favor.  Plaintiff offers no evidence other than this statement in support of his

25   claim that defendant Dickerson was deliberately indifferent to his medical care.  Since plaintiff

26   has completely failed to present evidence with respect to an essential element of his inadequate

medical care claim against Dickerson, summary adjudication in favor of defendant Dickerson should be granted.

B.  Defendant Douglas

Defendants argue that plaintiff admitted at his deposition that the only role defendant Douglas had in the May 2003 incident was that he called the inmates in from outdoor recreation and ordered them to lock down.[8]  In this regard, plaintiff testified at his deposition as follows:

> Q [Defendants' counsel].  Okay.  Now, Deputy Douglas, you've named him as a defendant?
>
> A [Plaintiff].  Yes.
>
> Q.  Deputy Douglas never used any force against you, right?
>
> A.  No.
>
> Q.  What are you suing Deputy Douglas for?
>
> A.  As per - - because of the fact that all officers, because of the fact that they were there, becomes torturers and the fact their failure to stop or intercede and anything that happened that was against policy.
>
> Q.  Do you know if he witnessed - - well, you never saw Deputy Douglas after he returned inside, correct?
>
> A.  I never saw Douglas, neither had I seen Dickerson.

---

[8]  The court is not persuaded by plaintiff's argument that his deposition testimony is unreliable because at the time of his deposition "he was very sick and on five different types of pain and antibiotics which may have impared [sic] plaintiff's reasoning."  (Suppl. Opp'n at 4-5.)  Even a plaintiff's sworn affidavit contradicting his prior deposition testimony cannot alone defeat a defendant's summary judgment motion.  See Radobenko v. Automated Equipment Corp., 520 F. 2d 540, 543-44 (9th Cir. 1975); see also Yatzus v. Appoquinimink School Dist., 458 F. Supp. 2d 235, 247 (D. Del. 2006) ("The 'sham affidavit' doctrine refers to the trial courts practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.  When considering a motion for summary judgment, a trial court should consider both the deposition testimony and the affidavit, with greater reliability attributed to the deposition.  Summary judgment may be granted based upon the deposition testimony if the court is satisfied that the issue potentially created by the affidavit is not genuine.")

1    Q.  Okay.  So you have no knowledge as to whether or not Douglas even witnessed the incident between yourself and Sergeant

2    Zwolinski, right?

3    A.  Yes, he was there.

4    Q.  He was where?

5    A.  He was there during that time.

6    Q.  Do you know if he witnessed when Sergeant Zwolinski forced you into the wall?

7

8    A.  Um, not yet.  Um, well, right now I can't answer that because I haven't done all of my discovery.

9    Q.  As you sit here today, you have no facts to support that Deputy Douglas witnessed Sergeant Zwolinski throwing you into the wall,

10    correct?

11    A.  Correct.

12  (Pl.'s Dep., lodged 9-1-06, at 137-38.)

13       When defendant Douglas was interviewed by internal affairs, he described his and

14  defendant Zwolinski's involvement in the incident as follows:

15    DOUGLAS:  Well after they had refused to lock down the last time Deputy Dickerson put a call out that all available officers respond

16    to the 300 pod for a mass failure to lock down um . . . so it was taken pretty seriously by everybody who was able to and you we

17    had 23 guys respond, 23 deputies respond.  Uh . . . . Sergeant Zwolinski was one of the first ones to come in from the elevators

18    and soon as I saw everybody out there I opened the door to the 300 pod and went in and Sergeant Zwolinski was right next to me uh . .

19    . . to my right when we entered and started ordering everybody to get up to the wall uh . . . . you know assume the position of safety,

20    facin' the wall, hands buried in their pants uh . . . . some . . . . some inmates didn't they just sat where they were and uh . . . . you

21    known we just kinda went in to secure everybody at the walls and I remember Sergeant Zwolinski who was to my right, as we were

22    coming in there was an inmate still seated on uh . . . . one of the couches or might have been one of the tables, I'm not sure what he

23    was sitting on but he didn't get up.  I mean everybody else was already heading for the walls and a lot of guys were already

24    standing at the wall.

     . . . .

25

26  /////

18

1    WOO:  Okay what did Sergeant Zwolinski do?

2    DOUGLAS:  . . . . uh he uh . . . . this inmate was just refusing to
     get up and go anywhere, Sergeant Zwolinski uh . . . . grabbed him
3    by the shoulders and took, turned him to face away from him
     because he was sitting facing us as we were coming in, Sergeant
4    Zwolinski took him and turned him to face away from us and uh . .
     . . directed him to the wall.  He . . . I saw him turn him and . . . .
5    and you know pick him up to a standing position.

6    WOO:  When you say he picked him up, how did he pick him up?

7    DOUGLAS:  Oh he just . . . . he took him by the shoulders and you
     know pulled him to a standing position.  He didn't lift him, his
8    body weight completely off the ground or anything.

9    WOO:  Okay.

10   DOUGLAS:  But just got him into a standing position and uh . . . .
     you know I don't know which wall he took him to cause I was
11   going off to secure other inmates by that time.

12   WOO:  Did you see . . . .

13   DOUGLAS:  And so it would have been you know after he got him
     . . . . by the time he got him up I was past him and he was behind
14   me.

15   WOO:  . . . . did you see Sergeant Zwolinski actually walking this
     inmate toward the wall?
16
     DOUGLAS:  No.
17
     WOO:  Okay so you only saw him as he grabbed this inmates [sic]
18   shoulders and pulled him up to a standing position?

19   DOUGLAS:  Right.
     . . . .
20
     WOO:  While you were in the day room and you say that you saw
21   Sergeant Zwolinski grab an inmate by the shoulder, is it by the
     shoulders or by his shirt or . . . . .
22
     DOUGLAS:  Shoulder, shirt I . . . . I didn't see exactly what kind
23   of grip, I was more concerned about um . . . . I saw he was gonna
     deal with the inmate and I was just more concerned about making
24   sure everybody else was secure.

25   WOO:  Are you certain that Sergeant Zwolinski grabbed this
     inmate by the shoulders and not by the front of the chest?
26

                                    19

1    DOUGLAS:  It could have been by the front of the chest I don't . . .
     like I said I don't know exactly how he grabbed him, grabbed him
2    basically by the upper, at the upper body and started moving him
     up out of the chair.
3
     WOO:  Okay and Sergeant Zwolinski's action toward that inmate,
4    from your perspective of that encounter, was it reasonable?

5    DOUGLAS:  Yes.

6    WOO:  Why, why is it reasonable?

7    DOUGLAS:  Because everybody, all the other, well all but you
     know maybe three or four inmates were complying with our verbal
8    directives to get up and go to the wall so we could you know
     secure the day room, secure all these inmates and uh . . . . you
9    know these few guys that were still refusing to follow our
     directives you know just by, you know by not getting up and going
10   to the . . . . to the wall were posing a threat to us and that you know
     we needed to secure everybody and get everybody locked down.
11   There's 25 inmates out and involved int his kind of protest you
     know and they were already uh . . . . you know saying you know
12   "this is bullshit" "this is fucked up" this sort of thing and they were
     you know, it was getting kind of heated uh . . . . verbally anyway.
13
     WOO:  So there was an expectation . . . .
14
     DOUGLAS:  There's an expectation that everybody need to get to
15   the wall and when we had that many officers respond uh . . . . you
     know its kind of, it is a serious situation.
16
     WOO:  Okay.
17
     DOUGLAS:  And have the you know these couple of guys . . . .
18
     WOO:  And you treat it as a serious breach of safety at this point?
19
     DOUGLAS:  Absolutely.
20
     WOO:  So do you believe that officer, I'm sorry Sergeant
21   Zwolinski what he did, as he was making contact with the inmate,
     do you think that it was excessive?
22
     DOUGLAS:  No.
23
     WOO:  Okay well within policy?
24
     DOUGLAS:  Yes.
25

26   (Opp'n, Ex. B at 4-5, 10; Pl.'s Exs., lodged 9-27-06, Internal Affairs Interview of Douglas at 9.)

1	The court finds that plaintiff has failed to produce any evidence in opposition to

2	the pending summary judgment motion suggesting a causal link between defendant Douglas'

3	actions and the alleged use of excessive force and denial of medical care.  Although the evidence

4	indicates that defendant Douglas was present when officers responded to the inmate protest, there

5	is no evidence that defendant Douglas participated in the alleged use of force or that he observed

6	anything that he should reasonably have concluded was an excessive use of force.  Moreover,

7	plaintiff's action does not include a conspiracy claim.  Even if plaintiff had included such a claim

8	in his amended complaint, there is no evidence that there was an agreement among the

9	defendants to violate plaintiff's constitutional rights.  See Woodrum v. Woodward County, 866

10	F.2d 1121, 1126 (9th Cir. 1989) (allegation of conspiracy requires showing that defendants

11	agreed to violate plaintiff's rights).

12	The court concludes that no reasonable finder of fact could find that defendant

13	Douglas violated plaintiff's constitutional rights based upon this evidence.  See Addisu, 198 F.3d

14	at 1134.  As defendant Douglas explained to the internal affairs investigator, there were

15	approximately 23 officers responding to the May 11 incident involving about 25 inmates.

16	Although he was in the day room with defendant Zwolinski, defendant Douglas was busy

17	securing other inmates, did not assist defendant Zwolinski and did not observe defendant

18	Zwolinski using excessive force.  As the Ninth Circuit has recently explained:

> 19	An officer's liability under section 1983 is predicated on his
> 20	"integral participation" in the alleged violation.  Chuman v. Wright, 76 F.3d 292, 294-95 (9th Cir. 1996).  "[ I]ntegral
> 21	participation" does not require that each officer's actions
> 	themselves rise to the level of a constitutional violation.  Boyd [v.
> 22	Benton County], 374 F.3d [773,] 780 [(9th Cir. 2004)].  But it does
> 	require some fundamental involvement in the conduct that
> 23	allegedly caused the violation.

24	Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007)

25	/////

26	/////

1      Here, the evidence before the court on summary judgment establishes that

2  defendant Douglas did not participate in any integral way in the incident to the extent it involved

3  plaintiff.  Accordingly, summary judgment should be granted in favor of defendant Douglas.

4                              DEFENDANTS' MOTION TO STRIKE

5      On September 27, 2006, plaintiff filed a document styled, "Notice Of Motion Of

6  Lodging Internal Affairs Report Case No. 03-IA-67," and lodged the Internal Affairs report "for

7  use in the motion for summary judgment, and at trial."  The lodged documents included: the

8  findings and recommendations of Captain Iwasa as a result of the Internal Affairs investigation

9  into the incident in question; a case summary of Internal Affairs investigation; a July 7, 2003

10 letter to plaintiff from Internal Affairs acknowledging the receipt of his complaint; an

11 investigative chronology; the work and complaint history of Sergeant Zwolinski; non-waiver

12 statements from defendants Dickerson and Zwolinski; transcripts of interviews with plaintiff,

13 Ricky Lawson, Kenney, defendant Bacoch, defendant Douglas, defendant Dickerson, defendant

14 Zwolinski, Deputy Gregory, Deputy Pai, Deputy Berhalter, David Pittack, Deputy Maurer,

15 Lieutenant Gliddon, inmate Branko Majstoric, Deputy Matthew Deaux, Deputy Jeral Thompson,

16 and Deputy Shane Glaser; the jail fifth floor log book; the jail work roster for May 11, 2003; and

17 the casualty report and workers' compensation claim submitted by defendant Dickerson.

18      Defendants now move to strike plaintiff's lodging of a copy of Internal Affairs

19 Report which was docketed by this court back on September 27, 2006.  In this regard, defendants

20 argue that the Federal Rules of Civil Procedure and the Local Rules of this court do not provide

21 for the lodging of an internal affairs report.  They also contend that, contrary to plaintiff's

22 assertion, the document is not an original but a redacted copy which was provided to plaintiff

23 pursuant to the court's March 3, 2006 discovery order.  Defendants argue that the report in its

24 entirety is not relevant to any matter currently pending before the court.  They assert that plaintiff

25 should have provided only the pertinent portions of the report as an exhibit to his opposition to

26 /////

1   the motion for summary judgment.[9]   Therefore, defendants request that the court strike the report

2   from the record and either destroy it or return the report to plaintiff.

3          Plaintiff has not filed opposition to the motion to strike.  However, in his

4   opposition to the motion for summary judgment, plaintiff has attached relevant portions of the

5   lodged documents.  The court has reviewed the lodged documents in their entirety in considering

6   defendants' motion for summary judgment.  The court finds that the lodged documents are

7   relevant to the court's determination of defendants' motion for summary judgment.  Therefore,

8   defendants' motion to strike will be denied.[10]

9                          REQUEST FOR SANCTIONS

10          Plaintiff has filed a motion seeking sanctions against defendants due to their

11   alleged failure to comply with the court's February 26, 2007 order requiring defendants Murray,

12   Johnson and Powell to provide responses to certain special interrogatories.  Plaintiff disputes

13   defendants' good faith effort to provide timely responses to those interrogatories and argues that

14   defendants should have attempted to contact plaintiff regarding their need for a second extension

15   of time to provide responses.  Plaintiff seeks monetary sanction in the amount of $3.00 which he

16   alleges was the cost he incurred in filing this motion.  Defendants oppose the motion for

17   sanctions, arguing that it is baseless.  Defendants explain the reason that additional time was

18   needed was to obtain verified responses which plaintiff could use in his supplemental opposition

19   to the motion for summary judgment.  Defendants argue that plaintiff suffered no prejudice as a

20   result.  The court agrees.

21   /////

22

23          [9]  Defendants note that in the event plaintiff may seek to use portions of the Internal
     Affairs report at trial, they intend to pursue a motion in limine.
24

25          [10]  Defendants may file a motion for a protective order or a more specific motion to strike.
     The latter would be appropriate, for instance, if they contend that the document lodged by
26   plaintiff is not a true copy of the original report.  Of course, defendants may still seek to preclude
     the use of the lodged documents at trial by way of a properly filed motion in limine.

On April 27, 2007, the court granted defendants a second extension of time to provide the discovery responses.  In the same order the court granted plaintiff additional time to file his supplemental opposition to the motion for summary judgment, allowing him time to consider the discovery responses in question.  Plaintiff's motion seeking sanctions against defendants will be denied.

CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that:

1.  Defendants' October 2, 2006 motion to strike the lodging of the internal affairs report on September 27, 2006, is denied; and

2.  Plaintiff's April 12, 2007 request for sanctions is denied.

Also, IT IS HEREBY RECOMMENDED that:

1.  Defendants Bacoch, Dickerson, Douglas, and Murray's September 1, 2006 motion for summary judgment/summary adjudication be granted as follows:

a.  Summary judgment be granted in favor of defendants Bacoch, Douglas, and Murray on all claims;

b.  Summary judgment be granted in favor of defendant Dickerson only as to plaintiff's medical care claim;

c.  Defendants Bacoch, Douglas, and Murray be dismissed from this action; and

2.  That this action proceed on plaintiff's claim that defendant Powell violated plaintiff's constitutional rights by issuing a false disciplinary charge against him and on plaintiff's excessive use of force claim against defendants Johnson, Dickerson, and Zwolinski.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

1   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

2   shall be served and filed within five days after service of the objections.  The parties are advised

3   that failure to file objections within the specified time may waive the right to appeal the District

4   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

5   DATED: August 22, 2007.

6

7

8   DALE A. DROZD

    UNITED STATES MAGISTRATE JUDGE

9   DAD:4

    will2518.57

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26